**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
BRYSON CITY DIVISION
CRIMINAL CASE NO. 2:14-cr-00016-MR**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) ) Appellee, ) ) ) vs. ) ) ) WALTER HENRY STANCIL, ) ) Appellant. ) _____ ) | **MEMORANDUM OF DECISION AND ORDER** |

**THIS MATTER** is on appeal to the Court from the Magistrate Judge based upon the Notice of Appeal [Doc. 2] filed by Appellant Walter Henry Stancil (herein "Defendant"). For the reasons that follow, the Court will affirm the Judgment of the Magistrate Judge.

## PROCEDURAL BACKGROUND

The United States Attorney named the Defendant in a single-count Bill of Information and charged him with the petty offense of removing property of the United States administered by the Forest Service, in violation of 36 C.F.R. § 261.9(b). [Doc. 1]. The Defendant proceeded to trial before the Magistrate Judge on September 30, 2014, and was convicted that day. [Doc.

10-1]. Magistrate Judge Howell sentenced the Defendant to 15 days' imprisonment. [Doc. 1-1]. The Magistrate Judge entered his Judgment on October 10, 2014. [Id.]. The Defendant timely filed his Notice of Appeal that same day. [Doc. 2].

## FACTUAL BACKGROUND

There is no disagreement about the facts of this case. As stated by defense counsel prior to the commencement of Defendant's trial, "I don't think there's going to be a lot of dispute of the facts if, really, any. It's just what this conduct constituted." [Doc. 10-1 at 3]. With that said, the facts established at trial were as follows.

Brian Southard, a criminal investigator with the United States Forest Service, testified that he was the case agent for a multi-year undercover investigation into illegal hunting known as "Operation Something Bruin." [Id. at 5]. During this investigation, Southard worked with North Carolina Wildlife Resources Commission Sergeant Chad Arnold. [Id. at 6]. As one facet of this investigation, Arnold contracted to be taken on guided bear hunts by an outfitter named Jerry Parker. [Id. at 7]. Through Parker, Arnold (and thus Southard) came to know about the Defendant. [Id.]. In like manner, Southard became familiar with some illegal bear baiting sites. [Id.]. According to Southard, one bait site had features similar to others in that:

2

> It was a site that had approximately a 14" or 16" metal culvert that had been cut off about 3' long, or maybe a little bit less. And part of that culvert, it was stood up on its end, I guess you could say. Part of that culvert was buried in the ground, maybe a foot and half of it was buried in the ground. Typically what we saw was ground up chocolate waste that had been put down inside the culvert and then a large flat rock, or a board and a rock, was laid over top of the culvert.

[Doc. 10-1 at 7]. Further, upon examining various bait sites, Southard noticed that one such site had a game camera set up to record activity near the bait. [Id. at 8].

Southard focused part of his investigation on one bait site in Macon County, North Carolina, known as the "rough road" bait site. [Id.]. Taking a cue from the baiters, in November 2012 Southard set up a Forest Service game camera "in an attempt to determine who was placing the bait in the culvert." [Id. at 9].

On December 7, 2012, Southard went to check the camera at the rough road bait site as well as to see if he could discern any human or bear activity there. [Id.]. He did not observe any signs of activity and, after looking at the game camera to see that it was still in the same place he had previously left it, Southard left the bait site without touching the camera. [Id.]. As Southard was driving away from the rough road site on Highway 106 South, he happened to pass the Defendant who was traveling in the opposite direction. [Id. at 10]. Southard quickly turned his vehicle around and caught

up with the Defendant's vehicle, a Toyota pickup. [Id.]. Southard followed the Defendant until the Defendant turned off Highway 106 onto the dead end road leading to the rough road bait site. [Id.]. When the Defendant left Highway 106, Southard continued further down Highway 106 a short distance and then parked his vehicle in such a way so that he could watch the entrance of the road leading to the bait site to watch for the Defendant to leave. [Id. at 11]. Southard waited about fifteen minutes at which time he saw the Defendant drive back onto Highway 106 from the bait site road and head south. [Id.].

Southard fell in behind the Defendant and followed him down Highway 106 South. Eventually, the Defendant turned off of Highway 106 at the residence of Jack Billingsley whom Southard knew to be a hunting associate of both the Defendant and Jerry Parker. [Id. at 15]. After observing the Defendant turn into Billingsley's driveway, Southard continued past Billingsley's home, made a u-turn, and traveled all the way back to the rough road bait site. [Id.]. At the bait site, Southard parked his vehicle and walked to the location where he had set up the game camera only to find the camera missing. [Id. at 16]. Southard returned to his vehicle and drove back toward Billingsley's home. Upon driving past the Billingsley residence, Southard noticed that the Defendant's truck was no longer there so he contacted a

4

colleague at the Georgia Department of Natural Resources and requested help in locating the Defendant. [Id.]. Approximately 30 minutes later, Southard learned that two Rabun County, Georgia, Sheriff's deputies had stopped the Defendant near his home. Southard traveled to the Defendant's home to interview him. [Id.].

When Southard arrived to meet the Defendant, he first spoke briefly with the Defendant and then asked him for consent to search his truck. [Id. at 17]. The Defendant consented to the search of his truck which resulted in Southard's seizure of an "SD Card."[1] [Id.]. The Defendant ultimately admitted the SD Card came from the game camera Southard had placed at the rough road bait site. [Id. at 18]. In addition to speaking with the Defendant, Southard compiled a written statement[2] based upon his interview with the Defendant. [Doc 10-2]. Southard testified that he was the person who wrote the statement, and thereafter, he read the statement back to the Defendant. After reading the statement to the Defendant, Southard gave the

---

[1] SD Cards are "Secure Digital" memory cards, a family of very popular flash memory cards used for electronic storage in portable computer devices. Introduced in 1999 by Panasonic, Toshiba and SanDisk, the original, full-size SD Card is the most popular digital camera storage, and the smaller mini and micro versions are widely used in mobile devices. Cards come in various write, or transfer, speeds for video recording. PC Magazine Online, http://www.pcmag.com/encyclopedia/term/50962/sd-card, last visited (Nov. 9, 2015).

[2] The Defendant's written statement was introduced into evidence by the Government as its Exhibit 1. [Doc. 10-1 at 58].

Defendant an opportunity to suggest changes to it, which he did. [Doc. 10-1 at 46-47]. Ultimately, the Defendant signed each page of the statement. [Doc. 10-2]. The Defendant told Southard that when he discovered the camera at the bait site, he thought the camera might belong to some bear hunters. [Docs. 10-1 at 43; 10-2 at 4]. Upon closer examination, however, the Defendant concluded it was unlike anything he had seen before. [Docs. 10-1 at 43]. When he took it to Billingsley's house, he "showed it to Jack and told him it was a 'time bomb.' When Jack saw it, he told me to get it out of there." [Doc. 10-2 at 4].

Southard then questioned the Defendant about the whereabouts of the game camera. [Doc. 10-1 at 18]. The Defendant stated that after he removed the SD Card and left Billingsley's home, he wrapped the camera in black plastic and hid it beneath a rock alongside a road he referred to as the "double gates" road. [Id. at 19]. The place where the Defendant hid the camera along "double gates" road was on Forest Service land. [Doc. 10-2 at 4]. The Defendant then took Southard to the location he described and retrieved the game camera from under the rock, still wrapped in plastic. [Doc. 10-1 at 19].

On cross examination, Southard admitted that the game camera he set up at the rough road bait site was placed on private property, "probably a

quarter of a mile" from the nearest Forest Service boundary. [Id. at 34]. Further, he testified that he conducted no investigation into the ownership of that land [Id. at 33], nor did he have a search warrant authorizing him to place the camera there. [Id. at 50]. As for the game camera itself, Southard stated it was purchased with government funds and was already in the Forest Service's inventory prior to the initiation of Operation Something Bruin. [Id. at 36]. Southard stated the camera was a nondescript Reconyx game camera [Id. at 55] and showed no signs or markings on its exterior indicating that it was the property of the United States in general, or of the Forest Service in particular.[3] [Id. at 37]. Southard testified, however, that it was his "general practice" to leave his business card enclosed within the back compartment of the camera, and before doing so, he would write, "Property of the United States" on the back of his business card. [Id. at 20].

With regard to how the camera operated, Southard explained:

> The way these cameras work is that you set the number of pictures you want it to take every time the sensor detects motion and/or a change in heat signatures. So, for example, I could set the camera to take a five-round burst every time the sensor is tripped.

---

[3] The game camera was introduced into evidence by the Government as its Exhibit 3. [Doc. 10-1 at 20].

7

[Id. at 39]. The only way to "disarm" or shut off the camera is to open the back compartment. [Id. at 38]. Inside the back compartment is where the batteries and the SD Card are held. [Id. at 28-29]. Southard stated that he was the primary person to service the camera's batteries and replace the SD Card. [Id. at 29]. He admitted, however, that Sergeant Chad Arnold and other officers could have serviced the camera without him present on December 4, 2012, three days before the Defendant took the camera from the bait site. [Id. at 30-31]. Likewise, according to Southard, it was also possible that his business card could have fallen out of the camera. [Id. at 28]. Arnold was called as a witness and testified that each time he serviced the game camera at the rough road site, including December 4, 2012, Southard's business card was inside the camera. [Id. at 66-67]. Arnold, however, could not recall whether Southard's business card had any handwriting on it. [Id. at 68]. Southard testified that he never found his business card on December 7, 2012: it was not in the camera when he seized it, or within the Defendant's vehicle, or on the Defendant's person. [Id. at 45].

Prior to trial, Southard viewed the images stored on the SD Card[4] seized from the Defendant's truck.  During trial, Southard testified that the images from the SD Card showed a series of events: the initial images depicted the Defendant present at the rough road bait site where the camera was placed; following those, the next images indicated that the camera was being physically moved; following those, the images showed the interior of the Defendant's truck; and, finally, the last set of images were shots of the exterior of Billingsley's residence and a neighbor's home next to it.  [Id. at 39].  Southard had previously testified that opening the back of the camera would terminate its recording function, and based thereon, Southard concluded that the Defendant had not opened the camera until he arrived at Billingsley's home.  [Id. at 50].

## STANDARD OF REVIEW

The Court has jurisdiction for this appeal pursuant to 18 U.S.C. § 3402, and the scope of the appeal is the same as the review of a district court's judgment by a court of appeals. Fed.R.Crim.P. 58(g)(2)(D).  On appeal, the Fourth Circuit reviews legal determinations of the district court de novo. United States v. Thompson, 421 F.3d 278, 280–81 (4th Cir. 2005). Due to

---

[4] The SD Card was introduced into evidence by the Government as its Exhibit 4.  [Doc. 10-1 at 58].

the nature of this appeal, there being no factual disputes, the Court will use the de novo standard.

**DISCUSSION**

The Defendant raises two issues in this Court, both of which challenge legal determinations. First, the Defendant claims the Magistrate Judge "erred by denying Appellant's Rule 29 motion for a verdict of acquittal based upon the inapplicability of 36 C.F.R. § 261.9(b) to the facts of this case." [Doc. 9 at 7]. Second, the Defendant claims he is entitled to be acquitted because "the United States Forest Service has no authority or jurisdiction to investigate crimes allegedly occuring [sic] on private lands nor to conduct surveillance upon private lands." [Id. at 9].

**I.     Applicability of 36 C.F.R. § 261.9(b).**

The Defendant was convicted of removing personal property belonging to the Forest Service (the camera and SD card) in violation of 36 C.F.R. §261.9(b).  As his first appellate argument, the Defendant asserts that 36 C.F.R. § 261.9(b) only prohibits the removal of Forest Service personal property if it is present on land administered by the Forest Service.  Since the Forest Service game camera at issue in this case was taken by the Defendant from private land, Defendant argues that he cannot be convicted

under 36 C.F.R. § 261.9(b). In short, the Defendant argues that the alleged violation charged in the Information fails to state an offense.[5]

The Forest Service Regulation at issue states, in relevant part:

**§ 261.9 Property.**

The following are prohibited:

. . . . . . .

(b) Removing any natural feature or other property of the United States.

36 C.F.R. § 261.9(b). The scope of this prohibition is defined by 36 C.F.R. § 261.1 which states:

(a) The prohibitions in this part apply, except as otherwise provided, when:

(1) An act or omission occurs in the National Forest System or on a National Forest System road or trail.

(2) An act or omission affects, threatens, or endangers property of the United States administered by the Forest Service.

(3) An act or omission affects, threatens, or endangers a person using, or engaged in the protection, improvement or administration of the National Forest System or a National Forest System road or trail.

---

[5] The current version of Rule 12(b)(3)(B)(v) of the Rules of Criminal Procedure would require the dismissal of the appeal based on the untimeliness of the Defendant's motion. The version of the Rule in effect at the time of Defendant's trial, however, allowed for the presentation of such motion "at any time while the case is pending[.]" Fed. R. Crim. P. 12(b)(3)(B) (effective until Nov. 30, 2014). Therefore, this claim is cognizable as part of this appeal.

11

> (4) An act or omission occurs within the designated boundaries of a component of the National Wild and Scenic Rivers System.
>
> (b) Nothing in this part shall preclude activities as authorized by the Wilderness Act of 1964 or the U.S. Mining Laws Act of 1872 as amended.
>
> (c) Unless an offense set out in this part specifies that intent is required, intent is not an element of any offense under this part.
>
> (d) None of these prohibitions apply to any person engaged in fire suppression actions.

36 C.F.R. § 261.1. Defendant argues that subsection (a)(1) extends only to personal property removed from land within in the National Forest System or from on a National Forest System road or trail. In this, Defendant is correct – as far as subsection (a)(1) is concerned. The Defendant, however, fails to recognize that it is subsection (a)(2) that applies to his actions. Read together, sections 261.9(b) and 261.1(a)(2) make it a petty offense to remove any personal property of the United States administered by the Forest Service which removal affects, threatens, or endangers such personal property.

In order to come within the purview of § 261.1(a)(2), an item of property must be personalty (such as a camera or an SD card), or something severed from realty (such as a tree or timber). Clearly, the Defendant's removal of a Forest Service camera "affected" it, especially since his removal constituted

12

a conversion of the camera. Further, the Defendant's removal of the SD Card from the camera endangered the Card because his continued possession of it after his disposal of the camera manifested the Defendant's intent to permanently deprive the Forest Service of it and, more importantly, any images stored on it. By his argument, Defendant seeks to add language to the statute that simply is not present. Section 261.1(a)(2) reads, "[a]n act or omission affects … property of the United States administered by the Forest Service." Defendant seeks for this court to interpret this to mean "an act or omission affects … <u>real</u> property.…" The regulation contains no such limitation. Moreover, the regulations specifically define the term "National Forest System" to mean the <u>real</u> property administered by the Forest Service. 36 C.F.R. § 261.2. Therefore, if the limitation Defendant argues had been intended, section 261.1(a)(2) would read "an act or omission affects … the National Forest System." In short, the Defendant asks this Court to rewrite the regulation.

Applying the plain meaning of the words used in the regulation, Defendant's removal of the camera and SD Card (<u>personal</u> property) belonging to the Forest Service constituted a violation of 36 C.F.R. §

13

261.9(b). For this reason, the Defendant's first assignment of error is overruled.[6]

## II. Alleged Unlawful Search Conducted on Private Land.

As his second appellate argument, the Defendant asserts the case against him should be dismissed because "a United States Forest Service Criminal Investigator conducted an unwarranted investigation with the use of a United States Forest Service surveillance camera upon privately owned lands for which the United States Forest Service had not obtained a search warrant or even permission to enter upon." [Doc. 9 at 9]. The Defendant cites to no authority in his brief to support this argument, the entirety of which

---

[6] Defendant also argued below that he had no intent to remove any Forest Service property. The Magistrate Judge obviously found that Defendant had such intent in finding the Defendant guilty. The facts of this case establish that the Defendant did not open the game camera until he reached the Billingsley residence and therefore had no reason to know who owned the camera. Soon after arriving at that residence, however, the Defendant told Billingsley that he was in the possession of a "time bomb" to which Billingsley responded, "get it out of here." [Doc. 10-2 at 4]. Clearly, the camera was no genuine time bomb. Consequently, the inference drawn by the Magistrate Judge from the Defendant's statement, in the light most favorable to the Government, shows that the Defendant must have discovered Southard's business card stating the camera was United States property and that Southard was a federal Forest Service agent. What made the camera a metaphorical time bomb from the Defendant's perspective was his assumption that it likely had recorded his bear baiting activities at the rough road site as well as recorded him taking the camera itself. To further the Defendant's analogy, in order for the Defendant to defuse this time bomb, the Defendant needed to eliminate any images depicting his incriminating behavior. He thus had to remove the SD Card. However, the Defendant would have discovered Southard's business card in the rear compartment of the camera before accessing and removing the camera's SD Card. When the Defendant removed and kept the SD Card, he then knew he was removing (and keeping) United States property administered by the Forest Service. These facts, and the logical inferences drawn from them, are substantial evidence to support the Defendant's conviction.

14

consumes only two paragraphs of such brief. [Id.]. Correctly framed, however, the question presented is whether the trial court should have suppressed the game camera and all images stored on the SD Card (and thereafter acquit the Defendant) because of the allegedly unconstitutional search conducted by the Forest Service agent on private property.

The Fourth Amendment's guarantee of the people's right "to be secure in their persons, houses, papers, and effects," protects individuals under a number of legal arrangements. U.S. Const. amend. IV. As both the majority and dissenting opinions in United States v. Gray, 491 F.3d 138 (4th Cir. 2007), recognized, the Fourth Amendment safeguards the privacy interests of owners, Agnello v. United States, 269 U.S. 20, 33 (1925), boarders, McDonald v. United States, 335 U.S. 451, 454–56 (1948), and tenants, Chapman v. United States, 365 U.S. 610 (1961), of a home, apartment, or other dwelling place. Co-tenants, co-owners, and co-occupants can also avail themselves of the Fourth Amendment's protections. Georgia v. Randolph, 547 U.S. 103 (2006). Likewise, travelers are entitled to be free from unreasonable government scrutiny in their hotel and motel rooms. Johnson v. United States, 333 U.S. 10 (1948). Gray, 491 F.3d at 144. The Fourth Amendment's protections, however, are not limited to "owners" or those similarly situated. "[A] person can have a legally sufficient interest in a

place other than his own home so that the Fourth Amendment protects him from unreasonable governmental intrusion into that place." Rakas v. Illinois, 439 U.S. 128, 142 (1978). Such persons protected can include overnight guests, Minnesota v. Olson, 495 U.S. 91, 95 (1990), employees in shared offices, Mancusi v. DeForte, 392 U.S. 364, 369 (1968), and persons making business calls from public telephone booths, Katz v. United States, 389 U.S. 347, 353 (1967). Gray, 491 F.3d at 165-66 (Michael, J., dissenting).

To have standing to complain of an alleged unconstitutional search, however, the aggrieved person must demonstrate that he has a legitimate expectation of privacy in the place searched. Smith v. Maryland, 442 U.S. 735, 740 (1979). In this matter, the place searched was private property known as the rough road bait site. The Defendant failed to address this issue by a motion to suppress as required by Rule 12 of the Federal Rules of Criminal Procedure and has thus waived the issue. See, Fed.R.Crim.P. 12(b)(C)(3) & (e) (effective until Nov. 30, 2014) (motions to suppress evidence must be raised before trial and the failure to do so constitutes waiver). Even if this issue remained cognizable on appeal, Defendant still would be unable to prevail. He exercised his constitutional right to remain silent at trial and to not produce any evidence whatsoever. Accordingly, the Court has no evidence before it of what "legally sufficient interest" the

Defendant had in the place encompassing the rough road bait site, if any, that would give rise to his subjective expectation of privacy "society is prepared to recognize as reasonable." Smith, 442 U.S. at 740. The Defendant, therefore, has established no standing to raise this Fourth Amendment argument. Accordingly, the Defendant's argument on this second issue should be dismissed.

## ORDER

**IT IS, THEREFORE, ORDERED** that Appellant Walter Henry Stancil's conviction and sentence are hereby **AFFIRMED.**

**IT IS SO ORDERED**.

Signed: November 10, 2015

Martin Reidinger
United States District Judge